**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

NATIONAL ELECTRICAL BENEFIT      \*
FUND,      \*
    Plaintiff,      \*
     \*
        v.      \*      Civil Action No. 11-cv-00184-AW
     \*
RABEY ELECTRIC COMPANY, INC.,      \*
    Defendant.      \*
     \*
     \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**<u>MEMORANDUM OPINION</u>**

Pending before the Court is Plaintiff National Electrical Benefit Fund's ("NEBF")'s

Motion for Summary Judgment against Defendant Rabey Electric Company, Inc. ("Rabey").

Doc. No. 26.  The Court has reviewed the parties' briefs and accompanying exhibits and

concludes that no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2011).  For the reasons

articulated below, the Court will GRANT Plaintiff's Motion for Summary Judgment.

I.        **FACTUAL AND PROCEDURAL BACKGROUND**

The following undisputed facts are taken from the Complaint, Answer, and the parties'

briefs and exhibits submitted in connection with Plaintiff's Motion for Summary Judgment.  The

Court also incorporates by reference the factual background provided in its Memorandum

Opinion addressing Defendant's Motion to Change Venue.  *See* Doc. No. 19.

The NEBF is a multiemployer pension benefit plan within the meaning of the Employee

Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1002(2) and (37)(A).  NEBF

was established pursuant to an agreement between the International Brotherhood of Electrical

Workers ("IBEW") and the National Electrical Contractors Association ("NECA").  Employers

agree to participate in the NEBF pursuant to collective bargaining agreements with the IBEW or

one of its affiliated local unions.

Defendant Rabey has been a signatory during all relevant periods to collective bargaining

agreements with IBEW Local Union 508 as the collective bargaining representatives of Rabey's

employees (the "Collective Bargaining Agreement" or "CBA").  Under the CBA, Rabey has

been and is currently obligated to submit contributions to NEBF on behalf of employees who

perform electrical work as classified by the agreement.  The Classification List in the CBA

covers the following categories of electrical workers: Journeyman Wiremen, Foremen, General

Foremen, Instrumentation Technicians with proper credentials, Journeymen Wiremen as

Certified Welders, and apprentices.   Rabey is also bound to the terms and conditions of the

Restated Employees Benefit Agreement and Trust for the NEBF (the "Trust Agreement"), which

has governed the administration of the NEBF at all times relevant to this action.

Both the Collective Bargaining Agreement and the Trust Agreement contain provisions

governing Rabey's contributions to NEBF.  Section 6.01 of the CBA provides:

> It is agreed that . . . the individual employer will forward monthly to the NEBFs
> [sic] designated local collection agent an amount equal to *3% of the gross
> monthly labor payroll* paid to, or accrued by, the employees in this bargaining
> unit, and a completed payroll report prescribed by the NEBF.

Doc. No. 26-4 (emphasis added).  Section 6.1 of the Trust Agreement similarly provides:

> Each Covered Employer shall pay by the fifteenth of each calendar month (except
> as provided herein) to the NEBF's designated local collection agent an amount
> equal to *3% of the gross labor payroll* for the preceding calendar month paid to,
> or accrued by, the Covered Employees, as described in this Article. . . .

Doc. No. 26-5 (emphasis added).  Section 6.2 of the Trust Agreement defines "3% of the gross

labor payroll" to mean:

> **6.2.1** as to Covered Employees who are in a bargaining unit represented by the
> Brotherhood or Local Union, 3% of *all wages and other compensation* paid to, or

accrued by, the Covered Employees in the Brotherhood bargaining unit or the Local Union bargaining unit for services performed for the Covered Employer; or

**6.2.2** as to Covered Employees who are not in a bargaining unit represented by the Brotherhood or Local Union, either (1) 3% of *all wages and other compensation* which the Covered Employer would pay, or which the Covered Employees would accrue, if the Covered Employees were receiving the wage rate received by the highest number of employees in the appropriate Brotherhood bargaining unit or the Local Union bargaining unit and working the normal straight time hours provided for in the appropriate labor agreement, or (b) 3% of *all wages and other compensation* paid to, or accrued by, the Covered Employees for services performed for the Covered Employer, if such amount is less than subsection (a).

*Id.* (emphasis added).  The term "wages and other compensation" excludes (1) "the value of non-cash fringe benefits," (2) "bona fide bonuses of an extraordinary nature (i.e., lump sum year-end bonuses, not ordinarily paid as part of a regular payroll period)," and (3) certain contributions made to other benefit funds.  *Id.* § 6.2.3.  Section 6.9 of the Trust Agreement provides that if an employer fails to make required contributions, NEBF is entitled to recover from the employer liquidated damages in an amount up to 20% of the total delinquency, 10% annual interest throughout the period of the delinquency, the costs of any audit, and costs and attorneys' fees incurred by the Trustees in enforcing the provisions of the Trust Agreement.  *Id.* § 6.9.

In 2010, NEBF conducted a routine audit of Rabey's payroll records from 2006 through 2009, and determined that Rabey had underpaid NEBF by $38,461.82.  This underpayment amount was the basis of NEBF's damages claims when it filed this action on January 21, 2011.  In its December 2, 2011 Motion to Change Venue, Rabey identified 37 employees for whom it claimed no contributions were owed because they did not perform employment covered by the CBA and Trust Agreement.[1]  During discovery, Rabey provided documentation to NEBF supporting a downward adjustment to the audit based on (1) the removal of all but one of the 37

---

[1] Rabey's Motion to Change Venue was denied on January 5, 2012.  Doc. No. 20.

employees identified by Rabey in its Motion to Change Venue[2] and (2) the removal of certain

extraordinary bonuses paid to Rabey employees.  Based on the downward adjustments, the

revised audit report shows that Rabey underpaid NEBF by $27,632.92 from 2006 through 2009.

According to the report, the underpayment is attributable to Rabey's alleged failure to contribute

on all covered employees and on all wages paid to or hours worked by covered employees.

NEBF's Motion for Summary Judgment, filed on May 18, 2012, sought an award for the

underpayment amount calculated in the revised audit report.  NEBF acknowledges in its Reply

Brief, however, that the revised audit report mistakenly included Jeremiah Cooper, one of the 37

employees Rabey identified in its Motion to Change Venue.  Based on the removal of this

individual from the audit's calculations, NEBF has revised its underpayment demand to

$26,954.69.  *See* Doc. No. 31-3.  Pursuant to Section 6.9 of the Trust Agreement, NEBF is also

requesting 10% annual interest on the underpayment throughout the period of the delinquency,

an award of liquidated damages in the amount of $5,390.94 (20% of the underpayment), and

audit costs in the amount of $4,448.76.  *See id.*

## II.    STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  The Court must "draw all justifiable

inferences in favor of the nonmoving party, including questions of credibility and of the weight

to be accorded to particular evidence."  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520

(1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

---

[2] NEBF argues that Rabey produced no documentation justifying the removal of the 37th employee, John Baggerley, while Rabey continues to maintain that Baggerley should be removed.

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in its favor, a nonmoving party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## III.   ANALYSIS

Sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, as amended by the Multiemployer Pension Plan Amendments Act (MPPAA), "provide specific remedies for the enforcement of federal pension laws and the collective bargaining and trust agreements executed pursuant to these laws." *Trustees of Glaziers Local 963 v. Walker & Laberge Co.*, 619 F. Supp. 1402, 1403 (D. Md. 1985). Section 1145 requires employers to make contributions according to the terms of such agreements:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Section 1132(g)(2) provides that where a plan prevails in enforcing section 1145, it shall be awarded damages in the amount of unpaid contributions, as well as interest, liquidated damages, and attorneys' fees.[3] In this case, the damages provisions of the Trust

---

[3] The relevant text of section 1132(g)(2) provides:

> In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court *shall* award the plan--

Agreement, Doc. No. 26-5 § 6.9, mirror the statutory damages provisions under Section

1132(g)(2).

Federal common law governs the interpretation and enforcement of ERISA-regulated

agreements and collective bargaining agreements.  *See Firestone Tire & Rubber Co. v. Bruch*,

489 U.S. 101, 110 (1989); *Textile Workers Union v. Lincoln Mills of Ala.*, 353 U.S. 448, 456

(1957); *see also United McGill Corp. v. Stinnett*, 154 F.3d 168, 171–72 (4th Cir. 1998)

(interpretation of ERISA-regulated plans); *Keffer v. H.K. Porter Co.*, 872 F.2d 60, 62 (4th Cir.

1989) (interpretation of collective bargaining agreements).  Courts should interpret ERISA-

regulated pension plans "under ordinary principles of contract law, enforcing the plan's plain

language in its ordinary sense."  *Wheeler v. Dynamic Eng'g, Inc.*, 62 F.3d 634, 638 (4th Cir.

1995).  Similarly, in interpreting the terms of a collective bargaining agreement, courts must

"begin by looking at the language of the agreement for any clear manifestation of the parties'

intent."  *Quesenberry v. Volvo Trucks N. Am. Retiree Healthcare Benefit Plan*, 651 F.3d 437,

440 (4th Cir. 2011) (quoting *Keffer*, 872 F.2d at 62).

Neither the Fourth Circuit nor its district courts have addressed the specific standard of

review for a summary judgment motion where an employer that is required to contribute to a

multiemployer pension plan challenges the plan's audit findings.  However, other courts have

held that judgment as a matter of law is appropriate where the plan presents an audit

---

(A) the unpaid contributions,
(B) interest on the unpaid contributions,
(C) an amount equal to the greater of--
    (i) interest on the unpaid contributions, or
    (ii) liquidated damages provided for under the plan in an amount not in excess of 20
    percent (or such higher percentage as may be permitted under Federal or State law) of the
    amount determined by the court under subparagraph (A),
(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
(E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2) (emphasis added).

demonstrating that contributions are owed and the employer fails to identify specific errors in the audit or provide documentation to rebut the audit's conclusions. *See, e.g.*, *Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692, 695–97 (6th Cir. 1994); *Trustees of Plumbers & Steamfitters Local Union No. 43 v. Crawford*, 573 F. Supp. 2d 1023, 1036–38 (E.D. Tenn. 2008); *Durso v. Cappy's Food Emporium, Ltd.*, No. CV 05-3498, 2006 WL 3725546, at *1–2 (E.D.N.Y. Dec. 14, 2006).

In this case, Rabey admits that it has been a signatory at all times relevant to this action to the Collective Bargaining Agreement with IBEW Local Union 508, and as such, it is obligated to contribute to NEBF on behalf of covered employees. *See* Doc. No. 1, ¶ 7; Doc. No. 5, ¶ 7. Rabey also admits that it is bound to the terms and conditions of the Trust Agreement, which has governed the administration of the NEBF at all times relevant to this action. *See* Doc. No. 1, ¶ 8; Doc. No. 5, ¶ 8. The Trust Agreement obligated Rabey to pay 3% of all covered employees' wages and other compensation, with limited exceptions, to NEBF. *See* Doc. No. 26-5, §§ 6.1-6.2. The Trust Agreement further provides that if an employer fails to make contributions, the Trustees are authorized to receive liquidated damages up to 20% of the amount of the delinquency, a ten percent annual interest rate, costs of the audit, and attorneys' fees and costs. *Id.* § 6.9. NEBF has presented affidavits from its Executive-Secretary Treasurer Lawrence Bradley and a revised audit report demonstrating that Rabey underpaid NEBF for the period from 2006 through 2009. *See* Doc. Nos. 26-2, 26-8, and 31-2. Rabey has identified no specific factual errors and has presented no documentary evidence that would contradict the revised audit report's conclusions or NEBF's damages claims. Rabey has therefore failed to establish a genuine issue of material fact, and NEBF is entitled to summary judgment.

Rabey argues that the Trust Agreement and Collective Bargaining Agreement are ambiguous as to who qualifies as a "covered employee," that its "temporary employees" should not be considered "covered employees," and that NBEF's audits wrongfully include contributions from these temporary employees. Rabey cites Article IV from the CBA, which sets forth the procedure by which the local union refers applicants for employment. *See* Doc. No. 30-6. Rabey claims that it hired several employees outside the referral process, such that they were "temporary employees" pursuant to section 4.06. *Id.* Rabey contends that it is not required to make contributions for "temporary employees" under section 6.01 of the CBA, which provides that employers must contribute "3% of the gross monthly labor payroll paid to, or accrued by, *the employees in the bargaining unit*." Doc. No. 30-1 (emphasis added).

The Court finds no ambiguity in the agreements as to which employees are covered for the purposes of NEBF contributions. In isolation, Section 6.01 of the CBA could be read to limit contributions to unionized workers, thereby excluding "temporary employees." However, Rabey ignores other provisions of the relevant agreements which clarify that an employer's contributions to NEBF are determined by the type of work performed, not whether an employee is temporary, permanent, unionized, or non-unionized. Rabey acknowledges that pursuant to the CBA's "Classification List," it is "obligated to make contributions on Journeymen Wiremen, Foreman [sic], General Foreman [sic], Instrumental technician [sic] with proper credentials, Journeymen Wiremen as Certified Welder [sic], and apprentices." Doc. No. 30, McCarthy Aff. ¶ 9 (citing Doc. No. 30-2, CBA § 3.13). The Classification List sets wages based on the type of work performed, but makes no distinction between unionized and non-unionized employees or between "temporary employees" and permanent employees. *See* Doc. No. 30-2. Furthermore, sections 6.2.1 and 6.2.2 of the Trust Agreement provide that "Covered Employees" include those

employees in a bargaining unit *and* those that are not in a bargaining unit. *See* Doc. No. 26-5.

Rabey also recognized in its Letter of Assent to be bound by the CBA that Local Union 508 is

the exclusive collective bargaining agent "for *all employees performing electrical construction*

*work within the jurisdiction of the Local Union* on all present and future jobsites."[4] Doc. No. 26-

3 (emphasis added). Therefore, viewing the plain language of the relevant Agreements, the

Court concludes that all electrical workers who performed the jobs as classified in Section 3.13

of the CBA are "Covered Employees" for the purposes of Rabey's contributions to NEBF,

whether they were temporary, permanent, unionized, or non-unionized. *See, e.g.*, *Clark v. Ryan*,

818 F.2d 1102, 1105 (4th Cir. 1987) (no ambiguity where the relevant agreements on employer

contributions were based on the type of work performed rather than the status of union

membership); *see also Teamster's Local 348 v. Kohn Beverage Co.*, 749 F.2d 315, 318 (6th Cir.

1984) ("The presence in the agreement of a recognition clause designating the union as the

exclusive bargaining agent for all employees indicates that fringe benefit contributions are

required for both union and non-union members."); *Manning v. Wiscombe*, 498 F.2d 1311,

1312–13 (10th Cir. 1974) (citing recognition clause and other provisions in concluding that

agreements were not ambiguous and contributions were required for both union and non-union

employees).

Rabey asserts that NEBF wrongfully included employees for whom no contributions

were owed in its audit calculations. But for every specific error cited by Rabey, NEBF either

removed the specific employees in question from its audit reports and damages claims,[5] or

---

[4] The Letter of Assent does not use the term "exclusive," but it refers to Section 9(a) of the National Labor Relations Act, which provides that "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the *exclusive* representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ." 29 U.S.C. § 159(a) (emphasis added).

[5] Following discussions with Rabey, NEBF agreed to remove Staff Zone employees and other individuals who did not perform covered employment during the audit period. *See* Doc. No. 31-2, Bradley Aff. ¶¶ 3–4. NEBF also

declined to do so because Rabey did not provide documentation supporting its claims that it had

no obligation to contribute for the employees.[6]  Rabey has not presented any evidence to this

Court suggesting that employees remaining in the revised audit report did not perform the type of

work covered by the CBA and Trust Agreement.  Rabey infers that non-covered employees

remain on the revised audit report because there were inaccuracies in previous audit calculations,

but NEBF's evidence in support of its motion for summary judgment cannot be rebutted based

on mere speculation and the building of one inference upon another.  *See, e.g.*, *Beale*, 769 F.2d at

214.  Indeed, Rabey has failed to present *any* specific, documentary evidence to this Court

demonstrating that erroneous calculations on particular employees form the basis of NEBF's

damages claims.

Rabey also contends that the term "gross labor payroll" in the Trust Agreement is

ambiguous, that it should be read to include only agreed-upon wages *under* the CBA itself, not

the total amount paid to any covered employee, and that NEBF's audits were wrongly calculated

based on per diems and bonuses paid to numerous employees. These arguments have no basis

given the plain language of the Trust Agreement, which defines "3% of the gross labor payroll"

to mean "all wages and other compensation" paid to or accrued by Covered Employees.  Doc.

No. 26-5, §§ 6.2.1, 6.2.2.  Section 6.2.3 provides for three narrow exceptions to the definition of

"wages and other compensation": (1) "the value of non-cash fringe benefits," (2) "bona fide

bonuses of an extraordinary nature (i.e., lump sum year-end bonuses, not ordinarily paid as part

of a regular payroll period)," and (3) contributions made to other benefit funds.  *Id.* § 6.2.3.  The

---

agreed to remove Jeremiah Cooper, but Cooper was mistakenly left in the revised audit report.  *Id.* ¶ 4.  NEBF has made this correction, however, and its revised damages claims are based on the subtraction of Cooper from its calculations.  *Id.* ¶ 4; *see also* Doc. No. 31-3.

[6] The only specific individual identified by Rabey is John Baggerley.  *See* Doc. No. 29, at 6.  However, Rabey has presented no documentary evidence to NEBF or to this Court suggesting that Baggerley was not a covered employee.

Trust Agreement plainly covers compensation above and beyond the wage rates provided in the

CBA, and the limited exceptions in the Trust Agreement do not exempt per diems or ordinary

"bonuses" from the employer's contribution obligations.  The Court finds no ambiguity in these

provisions.  *See Nat. Elec. Ben. Fund v. StarKo Elec. Servs., Inc.*, No. 06-1446 (JAG), 2008 WL

2683617, at *3–5 (D.N.J. July 1, 2008) (finding no ambiguity in the term "gross labor payroll" in

identical NEBF Trust Agreement).

Rabey maintains that the revised audit report continues to include individuals that

received non-covered compensation, but it has failed to identify those individuals and present

*any* specific, documentary evidence to the Court showing why these payments fell within any of

the limited exceptions under the Trust Agreement.  In every instance in which Rabey

demonstrated to NEBF that a payment fell within the exclusion for "extraordinary bonuses,"

NEBF removed the payment from the audit reports.  *See* Doc. No. 31-2, Bradley Aff. ¶ 7.

Rabey's speculative and unsupported conclusions are insufficient to establish a genuine issue of

material fact with respect to the audit's conclusions and NEBF's damages claims.  *See, e.g.*,

*Grimaldi*, 30 F.3d at 695–97 (holding that judgment as a matter of law against employer was

appropriate where it presented "no records at all" with respect to 80% of the work performed and

"incomplete records" with respect to the remaining 20%); *Crawford*, 573 F. Supp. 2d at 1036–38

(granting summary judgment to fund where employer "point[ed] to no specific errors and

offer[ed] no documentary evidence to rebut the auditor's determinations"); *Durso*, 2006 WL

3725546, at *1–2 (granting summary judgment to fund where the employer "ma[de] no

substantive argument as to the accuracy of the audit").

Rabey next argues that the affidavit of NEBF Executive Secretary-Treasurer Lawrence

Bradley is not sufficient to support NEBF's Motion for Summary Judgment.  Specifically, Rabey

contends that Mr. Bradley lacked personal knowledge that would support statements in the affidavit concerning the audit's findings. Rabey further argues that the auditor lacked the personal knowledge necessary to support the accuracy of the audit and Bradley affidavit. Rabey cites no legal authority suggesting that an auditor or an affiant relying on an audit must physically observe each employee performing covered employment for a court to rely on the audit or affidavit. In fact, ERISA requires that employers "maintain records with respect to each of [their] employees sufficient to determine the benefits due or which may become due to such employees. . . ." 29 U.S.C. § 1059(a). Given this statutory mandate, the Court finds that the NEBF auditor and Mr. Bradley were permitted to rely on the records Rabey provided during the audit process and discovery to draw reasonable inferences as to which employees performed covered employment. The employer may challenge the accuracy of the audit's conclusions, but in this case, Rabey has failed to raise a genuine issue of material fact regarding the accuracy of the revised audit report or NEBF's damages claims.

Finally, Rabey appears to challenge NEBF's entitlement to audit costs and attorneys' fees. Rabey has presented no genuine issue of material fact that it has failed to make contributions, however, and it does not dispute that it is bound to the terms of the Trust Agreement, which requires the payment of audit costs and attorneys' fees in such circumstances. *See* Doc. No. 30-4, § 6.9.5; *see also* 29 U.S.C. § 1132(g)(2)(D) (requiring employers to pay reasonable attorneys' fees and costs of the action). Rabey implies that NEBF was "spinning its wheels" in revising the audit figures on multiple occasions. Doc. No. 29, at 11. The Court finds no reason to reduce the award for audit costs solely because the party conducting the audit made downward adjustments as new facts came to light. The Court therefore concludes that an award for the costs of the audit is appropriate. The Court also concludes that an award of reasonable

attorneys' fees is required under the Trust Agreement and 29 U.S.C. § 1132(g)(2)(D), and NEBF

is directed to move for fees in accordance with the Local Rules of this Court.

## IV.    CONCLUSION

For the foregoing reasons, the Court will GRANT Plaintiff's Motion for Summary

Judgment.  A separate Order will follow.


___August 30, 2012____                                              /s/
          Date                                            Alexander Williams, Jr.
                                                          United States District Judge